UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| AMERICAN WILD HORSE CAMPAIGN, et al., | Case No. 3:18-CV-00059-LRH-CBC |
| Plaintiffs, | ORDER |
| v. | |
| RYAN ZINKE, et al., | |
| Defendants. | |

Plaintiffs (collectively American Wild Horse Campaign or "AWHC")[1] have filed a motion for summary judgment on all their claims against defendants (collectively Bureau of Land Management or "BLM"). (ECF No 32). BLM responded with its own motion for summary judgment on July 31, 2018. (ECF No. 34). On October 29, 2018, the Court held oral arguments on both AWHC's motion for summary judgment and a similar motion in a companion case.[2] Following oral arguments, AWHC filed an unopposed motion for the Court to take notice of supplemental authority. (ECF No. 42). For the reasons stated below, the Court will deny AWHC's motion for summary judgment and grant BLM's motion for summary judgment.

---

[1] American Wild Horse Campaign is a non-profit organization "whose mission is to increase protection of wild horses and burros to preserve these cherished animals and their natural behaviors for future generations to enjoy in the wild." (ECF No. 1 at 4).

[2] The companion case, *Friends of Animals v. Silvey* (3:18-CV-00043-LRH-CBC), concerns the same action undertaken by BLM, but AWHC challenges it on different grounds. Additionally, although the plaintiffs in both cases contest the same action, the administrative records are different. As such, the Court will issue two separate orders dispensing with both sets of motions for summary judgment.

# I. Factual Background and Procedural History

This action concerns BLM's approved plan to gather, round-up, and permanently remove approximately 9,000 wild horses from the Antelope and Triple B wild horse complexes ("Antelope and Triple B Complexes") located in southeastern Elko County and northern White Pine County, Nevada, pursuant to the Wild Free-Roaming Horses and Burros Act ("WHBA"), 16 U.S.C. §§ 1331 *et seq*. BLM oversees and administers the Antelope and Triple B Complexes alongside the wild horses that call the complexes home. The Antelope Complex is composed of the Antelope Herd Management Area ("HMA"),[3] the Antelope Valley HMA, the Goshute HMA, and the Spruce-Pequop HMA. The Triple B Complex is composed of the Triple B HMA, the Maverick-Medicine HMA, and the Cherry Springs Wild Horse Territory. Together, the Antelope and Triple B Complexes comprise over 2.8 million acres of public land managed by BLM.

In February 2016 and March 2017, BLM conducted wild horse population inventories throughout the Antelope and Triple B Complexes. (Administrative Record ("AR") at 365). Following the inventories, BLM discovered that there were roughly 9,525 wild horses residing in the complexes and that wild horses were beginning to migrate outside of designated HMAs, encroaching upon private land to forage for food and water. (*Id.*) The previously-determined Appropriate Management Levels ("AML")[4] for wild horse populations in the Antelope and Triple B Complexes is between 899 horses on the low range and 1,678 horses on the high range. (AR at 11). Thus, at the time of the inventories, the total wild horse population on the complexes was eleven times greater than the low AML and nearly six times greater than the high AML. Based on

---

[3] A Herd Management Area is an area of public land wherein wild horse populations reside and are overseen by BLM. Each HMA has a specific geographic boundary and is unique in its terrain features, local climate, and natural resources, and, as such, is uniquely administered by BLM. Currently, BLM manages over 177 separate HMAs across ten western states with 83 of BLM's HMAs in Nevada.

[4] An Appropriate Management Level is an expressed wild horse population range for a designated HMA with both an upper and lower limit, within which BLM manages wild horse populations. *Am. Wild Horse Pres. Campaign v. Jewell*, 847 F.3d 1174, 1178 (10th Cir. 2016). An AML range is determined after considering various factors of a particular HMA including terrain, climate, natural resources, and the ability of the HMA to sustain a wild horse population. "In each HMA, BLM officials are afforded significant discretion to compute [AMLs] for the wild horse populations they manage." *Fund for Animals, Inc. v. BLM*, 460 F.3d 13, 16 (D.C. Cir. 2006). Further, the purpose of an AML is "to move towards a thriving natural ecological balance," and an AML is used as "a trigger by which the BLM is alerted to address population imbalance." *In Def. of Animals v. U.S. Dept. of Interior*, 751 F.3d 1054, 1063–64 (9th Cir. 2014).

this information, in Spring 2017, BLM determined that there were over 9,000 excess wild horses living in the complexes and that a gather to remove them was required under the WHBA to bring the wild horse population back within the appropriate AML range.

Initially, BLM compiled a preliminary gather plan and Environmental Assessment ("EA") for gathering and removing the excess wild horses from the complexes known as The Preliminary Antelope and Triple B Complexes Gather Plan EA, DOI-BLM-NV-N030-2017-0010-EA. The preferred action under the preliminary plan was to gather and permanently remove approximately 6,700 wild horses from the complexes over a ten-year period, utilize population and fertility controls on a portion of the remaining wild horse population, adjust the sex ratio of the wild horse population within the HMAs, and manage a portion of the male wild horse population as castrated geldings. The preliminary gather plan was made available for public review and comment from July 21 through August 21, 2017. (AR at 196, 370). During this period, BLM received approximately 4,950 comment submissions,[5] including a lengthy comment from AWHC. (AR at 507–41).

After the close of the public comment period, BLM prepared a final gather plan and EA in December 2017: The Antelope and Triple B Complexes Gather Plan EA, DOI-BLM-NV-E030-2017-0010-EA ("2017 Gather Plan" or "Final EA"). (AR at 1–364). On December 21, 2017, BLM issued a final Decision Record approving the proposed gather, removal, and fertility controls outlined in Alternative A of the 2017 Gather Plan.[6] (AR at 365–73). Also on December 21, 2017, BLM issued a Finding of No Significant Impact ("FONSI") for the 2017 Gather Plan, finding that

---

[5] Although the BLM received almost 5000 comments during the public comment period, the Court notes that 97% of those submissions (more than 4,780 of the public comments) were form letters sent from an environmental activist website simply opposing the concept of the preliminary gather plan. *See* AR at 1626–13698.

[6] Approved Alternative A of the 2017 Gather Plan authorizes the BLM to: (1) gather and remove approximately 9,053 excess wild horses from the Antelope and Triple B Complexes to achieve a core breeding population at low AML; (2) administer population control measures including the use of fertility drugs to reduce fertility in mares; (3) adjust the sex ratios of wild horse populations to achieve a 60% male ratio within the core breeding population; and (4) return a portion of newly gelded male horses to the complexes to bring the total wild horse population to mid-range AML. (AR at 20–21, 365–6). Further, because gather efficiencies and available holding space would make it impossible for BLM to gather approximately 9,053 excess wild horses in a single gather, Alternative A of the 2017 Gather Plan is structured to allow for a series of roundups and population control methods over a ten-year period. (*Id.*)

"implementation of [the 2017 Gather Plan] will not significantly affect the quality of the human environment" and, therefore, "preparation of an Environmental Impact Statement ("EIS") [was] not required as per Section 102(2)(C) of the National Environmental Policy Act ("NEPA")." (AR at 374–77). BLM conducted the first gather of the 2017 Gather Plan on January 31, 2018; it removed approximately 1,300 horses from the Triple B Complex. (ECF No. 34 at 15).

On February 6, 2018, AWHC filed its complaint against BLM, seeking injunctive and declaratory relief relating to BLM's decision to geld wild male horses and use GonaCon (an immunocontraceptive vaccine) on wild mares.[7] (ECF No. 1).

## II. Legal Standard

### A. Summary Judgment

Summary judgment is appropriate only when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show "that there is no genuine issue as to any material fact and that the [moving party] is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). In assessing a motion for summary judgment, the evidence, together with all inferences that can reasonably be drawn therefrom, must be read in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Cnty of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1154 (9th Cir. 2001). The moving party bears the burden of informing the court of the basis for its motion, along with evidence showing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). On those issues for which it bears the burden of proof, the moving party must make a showing that is "sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. U.S.*, 799 F.2d 254, 259 (6th Cir. 1986).

To successfully rebut a motion for summary judgment, the non-moving party must point to facts supported by the record which demonstrate a genuine issue of material fact. *Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736 (9th Cir. 2000). A "material fact" is a fact "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

---

[7] In the companion case, the plaintiff primarily challenged the method in which BLM decided to conduct the roundup. Although the plaintiff touched briefly on the effects of gelding and GonaCon, it was not the focus of its complaint.

242, 248 (1986). Where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *See v. Durang*, 711 F.2d 141, 143 (9th Cir. 1983). A dispute regarding a material fact is considered genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248. However, the mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient to establish a genuine dispute; there must be evidence on which the jury could reasonably find for the nonmoving party. *See id*. at 252.

Where, as here, the parties filed cross-motions for summary judgment on the same claims, the court must consider each party's motion separately and on its own merits, "giving the non-moving party in each instance the benefit of all reasonable inferences." *A.C.L.U. of Nev. v. City of Las Vegas*, 466 F.3d 784, 790-91 (9th Cir. 2006). Further, in evaluating the motions, "the court must consider each party's evidence, regardless under which motion the evidence is offered." *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 532 (9th Cir. 2011). *See also Fair Hous. Council of Riverside County, Inc. v. Riverside Two*, 249 F.3d 1132, 1134 (9th Cir. 2001) ("[T]he court must consider the appropriate evidentiary material identified and submitted in support of both motions, and opposition to both motions, before ruling on each of them.").

**B. Administrative Review**

Under the Administrative Procedures Act ("APA"), a District Court may set aside an agency decision only if the court finds it to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. §706(2)(A). An agency decision is "arbitrary and capricious" if the agency (1) relied on a factor that Congress did not intend it to consider; (2) failed to consider an important factor or aspect of the problem; (3) failed to articulate a rational connection between the facts found and the conclusions made; (4) supported the decision with a rationale that runs counter to the evidence or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise; or (5) made a clear error in judgment. *Cal. Energy Comm'n v. Dep't of Energy*, 585 F.3d 1143, 1150–51 (9th Cir. 2009). At all times, the plaintiff carries the burden of showing that any decision or action made by the agency was arbitrary and capricious. *Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976).

### III. Discussion

AWHC's arguments can be grouped into two broad categories. First, it argues that BLM's decision to geld wild stallions and use GonaCon on wild mares was arbitrary and capricious under the APA because (1) BLM failed to wait for the results of gelding and GonaCon studies it had started prior to implementing both in its 2017 Gathering Plan; (2) its use of such methods violates the spirit of the Wild Horses and Burros Act ("WHBA"), which requires that BLM preserve the horses' wild and free-roaming behavior; and (3) BLM's EA discussion of gelding runs contrary to evidence contained within the record. (ECF No. 32). Its second set of arguments focuses on BLM's decision not to prepare an EIS. Specifically, it argues that BLM's decision to geld stallions and use GonaCon on mares (1) involves highly uncertain or unknown risks; (2) is highly controversial; (3) may establish a precedent; (4) risks harm to wild horses as cultural resources; and (5) threatens a violation of WHBA. (*Id*.) The Court will examine these arguments in turn.

### A. BLM's Use of Gelding and GonaCon on Wild Horses

#### 1. BLM's Alleged Failure to Wait for the Conclusion of Its Own Studies

AWHC first argues that BLM failed to consider a "critically relevant factor" when it did not wait for the results from studies it began on the effects of the use of gelding and GonaCon on wild horses. (ECF No. 32 at 20). The studies that AWHC refer to are two gather plans previously adopted by BLM. The first gather plan ("Water Canyon EA"), issued by BLM in August 2015, was designed to gather wild horses in a certain portion of the Antelope HMA. (ECF No. 34 at 16). Contrary to AWHC's assertion that the Water Canyon EA's purpose was to study the effects of fertility controls, BLM states its purpose was "*not* to conduct a study of GonaCon's impacts on wild horse behavior." (*Id*.) (emphasis in original). Even so, BLM used the Water Canon EA as a "pilot program" to see if "treating all mares with a fertility control vaccine in a small population would effectively suppress population growth and reduce the need for future gathers." (*Id*.) The second gather plan ("Conger EA"), issued by BLM in May 2016, analyzed a ten-year gathering effort to remove excess wild horses in the Conger and Frisco HMAs, adjust the sex ratio of the herds, geld a portion of the Conger HMA herd, conduct a behavioral study on both herds, and maintain some gelded animals in the Conger HMA for further observation. (*Id*. at 21). BLM

anticipated that the study of the behavioral effects of gelding would be one of several wild horse management issues studied over the course of the five-year research project. (*Id*.)

AWHC argues that BLM should have waited for the results from these two "studies" before approving the use of gelding and GonaCon in the 2017 Gather Plan. (ECF No. 32 at 20). It asserts that BLM "[made] no effort to explain how the agency could rationally proceed" without first obtaining the results from its studies. (*Id*. at 21). Therefore, according to AWHC, BLM failed to consider an important factor of its decision, rendering the EA arbitrary and capricious. (*Id*. at 22). BLM counters by arguing that AWHC has waived this claim because it failed to raise it during the administrative process, specifically during the public commenting period. (ECF No. 34 at 19).

The Court agrees with BLM. It is a well-established principle that "absent exceptional circumstances…belatedly raised issues may not form a basis for reversal of an agency decision." *Alliance for the Wild Rockies v. Savage*, 897 F.3d 1025, 1033 (9th Cir. 2018) (quoting *Havasupai Tribe v. Robertson*, 943 F.2d 32, 34 (9th Cir. 1991)). The proper time to raise an issue is during the comment process. *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 764–65 (2004); *Havasupai Tribe*, 943 F.2d at 34.[8] There is no "exceptional circumstance" present here. This is not a situation where an agency's failure to disclose a crucial piece of information prevented the plaintiff from raising a concern during the comment period. *See, e.g., Alliance for the Wild Rockies*, 897 F.3d at 1034. At the time the public comment period opened on July 21, 2017, the Water Canyon EA, Conger EA, and their contents were at least one year old and readily available to the public. There was no obstacle preventing AWHC from raising the issue during the comment period. AWHC's failure to do so prevented BLM from addressing AWHC's specific concern during the appropriate period, and AWHC raising the issue at the District Court level places BLM at an unfair disadvantage. *Alliance for the Wild Rockies v. Tidwell*, 623 F.Supp.2d 1198, 1206 (D. Mon. 2009).

AWHC attempts to rectify its misstep by arguing that its general comments about gelding and GonaCon provided sufficient notice to BLM about its uncompleted studies in the Water

---

[8] The Ninth Circuit has differentiated between situations where a plaintiff fails to raise a specific factual contention during the public comment process and where a plaintiff declines to participate in an agency's fact-finding process. *'Ilio'ulaokalani Coalition v. Rumsfeld*, 464 F.3d 1083, 1092 (9th Cir. 2006). The former results in the waiver of the argument whereas the latter does not necessarily result in waiver. *Id*.

7

Canyon and Conger gathering plans. AWHC states that it raised the issue with "sufficient clarity" when, during the comment period, it called for more research into GonaCon and gelding because their effects on wild horses were purportedly unknown. (ECF No. 36 at 12). The Court disagrees. As the Supreme Court stated in *Vermont Yankee*, "administrative proceedings should not be a game or forum to engage in unjustified obstructionism by making cryptic and obscure reference to matters that 'ought to be' considered and then, [without doing more], seeking to have that agency determination vacated on the ground that the agency failed to consider matters 'forcefully presented.'" *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 553–54 (1978). While there is no evidence to suggest that AWHC has engaged in "unjustified obstructionism," there is no dispute as to whether AWHC mentioned the ongoing studies related to the Water Canyon and Conger gather plans during the comment period – it did not. AWHC's calls for "more research" were too vague to provide BLM with notice that what AWHC was *really* requesting was that BLM complete its two studies before proceeding with the use of GonaCon and gelding. There is no requirement that a plaintiff make its comments with laser precision or use specific legal terms to trigger judicial review. *See, e.g., Idaho Sporting Congress, Inc. v. Rittenhouse*, 305 F.3d 957, 966 (9th Cir. 2002). But a plaintiff cannot, as AWHC has done here, make vague requests during the comment period and then claim that the agency should have known exactly what it was referring to.

Therefore, the Court finds that AWHC has waived any argument concerning the ongoing research in the Conger and Water Canyon gather plans.[9]

///

---

[9] Although the Court does not reach the issue here, the Court is highly skeptical of AWHC's argument. AWHC would seek to prohibit BLM from utilizing any method of fertility control that it is currently studying, even if those studies would not be completed for several years or decades. This would effectively penalize BLM for conducting studies, disincentivize it from conducting studies in the future, and could very well prevent BLM from effectively managing wild horse populations in various HMAs.

The parties also submitted numerous alternative arguments if the Court had determined that AWHC had not waived its argument concerning the Conger and Water Canyon EAs. AWHC filed a motion on November 30, 2018, alerting the Court to a recently-decided Supreme Court case that affected one of these arguments. (ECF No. 42). Because the motion is unopposed, the Court will grant AWHC's motion even though the Court does not reach that issue in the opinion.

## 2. Violation of WHBA's Mechanism to Preserve "Wild and Free-Roaming Behavior"

AWHC next asserts that BLM's decision to utilize gelding and GonaCon was arbitrary and capricious because it failed to address concerns contained within a National Academy of Sciences ("NAS") report about the effects that gelding and GonaCon have on wild horse behavior. (ECF No. 32 at 23–24). AWHC asserts that by not directly addressing the NAS report's concerns, BLM violated the WHBA, which requires that, *inter alia*, BLM consult with the wildlife agencies of the states where the horses are located, individuals who have been recommended by NAS, and other individuals who have scientific expertise and special knowledge of wild horse protection. 16 U.S.C. §1333(b)(1). The WHBA itself governs the management and treatment of wild horses across the nation, and it requires that BLM manage wild free-roaming horses as components of the public lands. *Id*. §1333(a). AWHC argues that BLM improperly ignored NAS's findings regarding gelding and only selectively quoted from the study's findings regarding GonaCon, both of which purportedly constitute a violation of WHBA's consultation requirement. (ECF No. 32 at 23). BLM responds by arguing that while it did not directly cite to the NAS's discussion of gelding, it addressed many of NAS's gelding concerns in the 2017 Gather Plan. (ECF No. 34 at 25–26). Additionally, it states that it repeatedly cited and even adopted many aspects of NAS's report as it related to GonaCon. (*Id*. at 26).

AWHC's argument is relatively case citation-free except for one recent case from the District of Idaho, *American Wild Horse Pres. Campaign v. Zinke*, 2017 WL 4349012 (D. Idaho Sept. 29, 2017) (hereinafter "*American Wild Horse*"). In *American Wild Horse*, the court determined that BLM had violated NEPA, and thus the APA, when it failed to discuss the NAS report[10] at all. *Id*. at *8. The court noted how even though BLM was aware of the report, there was no mention of it or its contents in the EIS or Record of Decision ("ROD"), nor was there any evidence that BLM even considered the report. *Id*. BLM was unable to point to any portion of the EIS or ROD that discussed the NAS report; instead, BLM argued that the NAS report nevertheless supported its decisions in the EIS. *Id*. This "*post hoc*" reasoning, the court stated, was insufficient to meet the APA and NEPA's requirements. *Id*. *American Wild Horse* has no applicability here,

---

[10] The NAS report in *American Wild Horse* and the one before the Court are the same.

because there, BLM failed to address (and therefore, in the court's view, consider) any portion of the NAS report. 2017 WL 4349012 at *8. As AWHC concedes in briefing, BLM cited the NAS report throughout the 2017 Gather Plan, albeit not in the section discussing gelding. (ECF No. 32 at 24); (*see, e.g.*, AR at 22–23, 161, 163, 168, 172, 174–76).

After examining the record, the Court finds that BLM appropriately considered the NAS report in its 2017 Gather Plan. AWHC's contention that BLM "ignored" the NAS report's conclusions about the effects of gelding is without merit. (ECF No. 36 at 17). AWHC seemingly ignores the fact that BLM specifically addressed many of the report's concerns about gelding, and in many instances, the EA's discussion of gelding answered questions that the NAS report posed but did not answer. For example, the NAS report noted how that while individual horses would respond differently to gelding, some may become less aggressive and lose their sexual interest. (AR at 29312). The 2017 Gather Plan noted this, citing studies explaining that although libido "tends to be gradually lost after castration," "[s]tallion-like behavior in domestic horse geldings is relatively common." (AR at 151). The EA also explained how "[n]o study has quantified the effect of castration on aggression in horses," but that one study from 1995 noted that "aggression was a problem in domestic horse geldings who also exhibited sexual behaviors." (*Id.*) The NAS report was equivocal and rather unenlightening when discussing the effects of releasing gelded horses back onto the range, opining that "[k]eeping a portion of the male population nonreproducing by gelding could increase aggression and competition in herds or decrease it," and that "reproductive success may be reduced or increased." (AR at 29312). The EA, however, noted that there were not many studies available about the effects of releasing gelded horses back to the range because the act itself is relatively rare. (AR at 144). Even so, the EA explained that one study found that social rank among geldings was "directly correlated" to the age at which the horse was gelded. (*Id.*) Another study cited in the EA noted how the presence of geldings "did not appear to affect the social behavior of mares or negatively influence parturition, mare-foal bonding, or subsequent maternal activities." (AR at 145). Had BLM simply cited the NAS report in its discussion of gelding as AWHC demands, many important questions about gelding behavior and their impact on the rest of the herd would have gone unaddressed.

BLM also directly addressed a comment that requested that BLM consider the recommendations from the NAS report. The comment stated that "[g]elding will result in reduction or complete loss of the male type behaviors necessary for maintenance of social organization, band integrity, and expression of natural behaviors." (AR at 302). This is the only specific part of the NAS report discussing gelding that AWHC cites as evidence for the proposition that BLM did not properly consider the NAS's recommendations on gelding. But AWHC's heavy reliance on this one statement is misplaced. The statement describes the effects of gelding on a single stallion, and in that context, it is factually accurate. In a scenario where all male horses in a herd are gelded, the report's statement is also accurate. But as BLM correctly explained in the EA, the NAS report also stated that "[t]he effect that gelding a portion of the males in a herd would have on reproduction and behavior could not be predicted at the time this report was prepared." (AR at 29312). This portion of the report is especially relevant because the Antelope and Triple B Complexes Gather Plan, BLM's chosen action, only authorized BLM to return "some" gelded horses to the range. (AR at 366). BLM does not have the authorization to geld all the male horses on the range. This means that a portion of the wild male horses in the Antelope and Triple B Complexes will be gelded, but the rest will not be. AWHC essentially criticizes BLM for not addressing a statement within the NAS report that has no relevance to BLM's chosen plan. And as the Court addressed in the previous paragraph, the final EA contains a thorough discussion of how the presence of some geldings on a range affects the rest of the herd.

The crux of AWHC's WHBA argument is that the "gelding" section of BLM's 2017 Gather Plan does not contain a direct citation to the section of the NAS report discussing gelding. (ECF No. 36 at 17). AWHC, however, cites to no statutory provisions or caselaw that requires BLM to cite to a specific section of a NAS report (or indeed, any other report) in the corresponding section in its EA. AWHC essentially requests that this Court impose additional requirements upon the government that are simply not anywhere to be found within the WHBA.[11] The Court declines to

---

[11] At oral argument, counsel for AWHC stated that because BLM did not cite to a specific portion of the NAS report's gelding section in its own discussion of gelding, BLM "did not consider the [NAS's] critical findings about gelding, including that it may cause total loss of sex drive." In the Court's view, this conclusion requires a great leap in logic, and in any event, is not supported by the law.

do so. The WHBA only imposes a duty on the government to "consult" with the authorities that Congress listed in the Act. 16 U.S.C. §1333(b)(1). It does not require that BLM directly respond to every part of every expert report within the administrative record, nor does it require that BLM adopt the authorities' recommendations.

As for AWHC's arguments concerning the EA's discussion of GonaCon, they too are baseless. AWHC asserts that BLM erred because it only "selective[ly]" cited to the NAS report's discussion of GonaCon. (ECF No. 32 at 25). This is the classic "cherry picking" argument, which is often made but rarely successful. As with the gelding issue, AWHC only points to one portion of the NAS report's discussion of GonaCon that it alleges BLM failed to address – the report's call for further study of GonaCon. (ECF No. 32 at 19; AR at 29320). The NAS report ultimately concluded that while further studies would need to be done on GonaCon's behavioral effects, "it is a promising candidate as a female-directed fertility-control method" because it "preserves natural behavior patterns while effectively preventing reproduction." (AR at 29320). The 2017 Gather Plan noted the NAS report's conclusion and cited several behavioral studies, some of which were issued after the release of the NAS report in 2013. (AR at 175). These included a 2014 study that found that "GonaCon treated mares had similar rates of reproductive behaviors that were similar to those of pregnant mares," and a 2009 study that "found no difference in sexual behaviors in mares treated with GonaCon and untreated mares" and "no difference between treated and untreated mares in terms of activity budget, sexual behavior, proximity of mares to stallions, or aggression." (AR at 175–76). AWHC does not explain how these GonaCon behavioral studies or the others cited by BLM are deficient or improperly relied upon. Rather, the 2017 Gather Plan's discussion of GonaCon demonstrates a careful and thoughtful review of the available literature. As the Court stated above, BLM is only required to consider and consult with the authorities that Congress intended it to. AWHC may be unhappy with the conclusion that BLM reached, but neither that nor the fact that BLM did not quote from every part of the NAS report renders the agency's decision arbitrary or capricious.

///

///

<u>3. Whether BLM's Discussion of Gelding is Contrary to the Administrative Record</u>

AWHC next argues that BLM's decision to utilize gelding was arbitrary and capricious because it is inconsistent with evidence contained within the administrative record. (ECF No. 32 at 26). It argues that BLM ignored evidence that it (AWHC) submitted from two wild horse experts (Drs. Rutberg and Kirkpatrick), experts whom BLM has relied on in the past. (*Id*.) It further asserts that gelded horses cannot be considered "wild" or "free-roaming" under the WHBA because of side effects stemming from the gelding procedure. (*Id*. at 27).

AWHC's argument concerning Drs. Kirkpatrick's and Rutberg's opinions is similar to the argument it made about BLM's treatment of GonaCon. As the Court stated above, AWHC's allegations of cherry picking and only selectively relying on evidence is without merit. The method by which an agency is tasked with reviewing expert evidence is based on the process, not the results. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971) (The Court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."). As the Supreme Court explained, courts are not permitted to reweigh the evidence and substitute their judgment for that of the agency. *Id*. When specialists express conflicting views, an "agency must have discretion to rely on the reasonable opinions of its own qualified experts even if…a court might find contrary views more persuasive." *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 378 (1989). As explained in the previous section, BLM thoroughly summarized the current literature on how gelding affects the behavior of wild male horses. BLM also directly addressed the opinions of Drs. Kirkpatrick and Rutberg, ultimately determining them to be "speculative" because neither of them had actually conducted a study on the issue. (AR at 288). BLM is not obliged to follow the recommendations of any one particular expert so long as the agency fairly considered the available evidence and the issue before it. In this case, BLM clearly has.

AWHC takes issue with BLM's assertion that there is "no evidence based on available research or observations" to suggest that gelded horses have their movement hindered or would become "docile or obedient simply as a result of the castration." (ECF No 32. at 26) (citing AR at 152). AWHC points to several of BLM's statements in the 2016 Conger EA, that the geldings were

"easy to recapture" and that they remained close to where they were released, as evidence that their movement was hindered. (ECF No. 32 at 27) (citing AR at 30473). There is no conclusive evidence that gelding was the cause of the horses limited movement, however, and the Court declines to accept AWHC's assumptions as fact. Moreover, AWHC omits crucial information about the nature of BLM's knowledge; the Conger EA explicitly states that BLM's knowledge was based on "anecdotal observations from various BLM HMAs across the west…not based on a scientifically sound study design." (AR at 30473). BLM was correct in noting that there were no legitimate scientific studies conducted that found that the gelding procedure restricted the wild horses' movements. BLM's anecdotal field observations are not appropriate substitutes for scientific studies. AWHC seemingly relies on BLM's anecdotal observations as scientific fact; had BLM used the same observation method to reach a conclusion that did not support AWHC's argument, the Court is doubtful that AWHC would find them as credible as it apparently does.

AWHC also argues that horses that have been gelded are not "wild" or "free-roaming" horses as defined under the WHBA. (ECF No. 32 at 26–27). The Court disagrees. Under the WHBA, wild horses are defined as "all unbranded and unclaimed horses and burros on public lands in the United States." 16 U.S.C. §1332(b); 43 C.F.R. §4700.0-5. Based on this definition, a horse will be considered wild when it is unbranded, unclaimed, and on United States public land. Although the WHBA does not contain a definition for the term "free-roaming," in its handbook, BLM has defined that term as the ability of a wild horse to move without restriction by fences or other barriers within an HMA. (AR at 15042). So even if the Court were to accept AWHC's argument that gelding significantly reduces a horse's ability to move around, it would not violate the WHBA's definition of "wild" or BLM's definition of "free-roaming"; the gelded horse would still be unbranded, unclaimed, on United States public land, and not constrained by a fence or other barrier. More significantly, AWHC does not dispute BLM's definition of "free-roaming," nor does it point the Court to any alternative definition for the term "wild." The language of the WHBA is plain and unambiguous.

In sum, the Court finds that AWHC has failed to demonstrate that BLM's decision to use GonaCon and gelding on wild horses was arbitrary or capricious in violation of the WHBA or

APA. As a reminder, the plaintiff carries the burden of demonstrating that the agency's action was arbitrary or capricious. *Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976). Therefore, the Court will deny AWHC's motion for summary judgment and grant BLM's motion for summary judgment on this claim.

### B. BLM's Decision to Not Prepare an EIS

AWHC's second main argument is that BLM acted arbitrarily and capriciously when it violated NEPA by not preparing an EIS analyzing the effects of gelding and GonaCon on wild horses. (ECF No. 32 at 28). NEPA is Congress's basic "national charter for protection of the environment." *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 349 F.3d 1157, 1166 (9th Cir. 2003). NEPA serves two fundamental purposes: (1) to require agencies to consider detailed information concerning significant environmental impacts of a proposed action; and (2) to inform the public that an agency has considered the environmental impacts in its decision-making process while ensuring that the public can access and contribute to the decision-making process via comments. *San Luis Obispo Mothers for Peace v. Nuclear Regulatory Comm'n*, 449 F.3d 1016, 1034 (9th Cir. 2006); *Robertson v. Methow Valley Citizens Council*, 490 U.S. 322, 349 (1989). NEPA does not impose any direction or restriction on the ultimate action of an agency. *Hillsdale Envtl. Loss Prev. v. U.S. Army Corps of Eng'rs*, 702 F.3d 1156, 1166 (10th Cir. 2012). Instead, "NEPA imposes procedural, information-gathering requirements on an agency[.]" *Id*. If, after completion of an EA, an agency determines that the contemplated federal action will not significantly affect the environment "the federal action may issue a finding of no significant impact ["FONSI"]…in lieu of preparing an EIS." *Native Ecosystems Council v. Tidwell*, 599 F.3d 926, 937 (9th Cir. 2010).

Generally, agencies consider two broad factors to determine whether an action may significantly affect the environment: context and intensity. 40 C.F.R. § 1508.27. "Context simply delimits the scope of the agency's action, including the interest affected." *National Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 731 (9th Cir. 2001). Intensity refers to the severity of impact, and the regulations identify ten factors that agencies should consider in evaluating

intensity." 40 C.F.R. § 1508.27(b)(1)-(10) (listing factors).[12] The "intensity" factors are the factors at issue here. If substantial questions are raised as to whether a proposed project "may cause significant degradation of some human environmental factor" then a formal EIS is required before approval of the agency action. *Pub. Citizen v. Nuclear Regulatory Comm'n*, 573 F.3d 916, 929 (9th Cir. 2009).

AWHC argues that the use of gelding and GonaCon implicates five of the ten intensity factors, which in turn mandates the preparation of an EIS: (1) their use presents "highly uncertain or unknown risks; (2) their use is highly controversial; (3) BLM's decision to utilize them "may establish a precedent"; (4) their use will harm wild horses as a cultural resource; and (5) their use threatens a violation of the WHBA. (ECF No. 32 at 29–36). The Court will examine each factor in turn.

### 1. Highly Uncertain or Unknown Risks

AWHC first asserts that the use of GonaCon and gelding presents "highly uncertain" or "unknown" risks. (ECF No. 32 at 29). AWHC relies entirely on the 2013 NAS report as evidence of the allegedly uncertain and unknown effects of GonaCon and gelding. (*Id.*) AWHC does not appear to dispute the direct effects of GonaCon and gelding – i.e. the biological impacts or the way in which BLM would administer the procedures. Instead, it argues that the behavioral effects, such as how the presence of geldings in a herd will affect the rest of the wild horses, are in dispute because the NAS report did not reach a conclusion. (*Id.*)

In this context, the word "highly" means that a plaintiff will not prevail just because it can produce some favorable evidence. *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233,

---

[12] The intensity factors enumerated by 40 C.F.R. § 1508.27(b) include: (1) impacts that may be both beneficial and adverse; (2) the degree to which the proposed action affects public health or safety; (3) unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas; (4) the degree to which the effects on the quality of the human environment are likely to be highly controversial; (5) the degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks; (6) the degree to which the action may establish a precedent for future actions; (7) whether the action is related to other actions with individually insignificant but cumulatively significant impacts; (8) the degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources; (9) the degree to which the action may adversely affect an endangered or threatened species or its habitat; and (10) whether the action threatens a violation of Federal, State, or local law.

1240 (9th Cir. 2005). Cherry picking information out of the record is insufficient to meet the burden. *Id.* Typically, Courts have found the risks of a proposed action to be unknown or uncertain where the government employs new techniques, the techniques are unique to the region, or they are experimental such that the results are unpredictable. *Conservation Congress v. U.S. Forest Serv.*, 235 F. Supp.3d 1189, 1204 (E.D. Cal. 2017); *National Parks Conservation Association v. Semonite*, 311 F. Supp.3d 350, 369 (D.D.C. 2018).

Here, the Court finds that the risks of using gelding and GonaCon on wild horses are not unknown or highly uncertain. None of the usual situations are present here. As BLM has noted, gelding is hardly a new or revolutionary procedure, and AWHC has not argued to the contrary. (AR at 143). As for GonaCon, the administrative record indicates that it is one of many GnRH (gonadotropin releasing hormone peptide) vaccines, which have been utilized for some time, and there have been numerous studies conducted on its mechanics and effects. (AR at 26, 158–60). Neither gelding nor GonaCon are exclusively used in Northern Nevada, and the consequences of using them are well-known. (*Id.*) AWHC effectively concedes that there is no uncertainty as to the mechanics of the techniques, how they are applied, or the biological effects they have on the wild horses. The only "uncertainly" as to their use, according to AWHC, is how treated wild horses impact herd dynamics if they are placed back onto the range. But as the Court previously explained, BLM discussed the available research on how gelding affects a wild stallion's behavior and how it affects the rest of the herd. (AR at 144–45, 151). In fact, BLM dedicated fourteen pages of the 2017 Gather Plan to discussing the behavioral effects of gelding. (AR at 141–54). Moreover, the behavioral effects of GonaCon are not unknown, as BLM cited to studies explaining that treated mares did not have any noticeable impact on the herd. (AR at 175–76). AWHC has not pointed to any evidence in the record that would lead the Court to believe that further gelding studies would reach conclusions at odds with the studies already in the records. The fact that AWHC can point to previous BLM statements expressing a desire for more research does not obviate the research that is in the record nor does it meet threshold necessary to trigger the preparation of an EIS. *See Center for Biological Diversity v. Kempthorne*, 588 F.3d 701, 712 (9th Cir. 2009) (holding that some uncertainty about a project's effects is not enough to mandate the preparation of an EIS);

*Envtl. Defense Center v. Bureau of Ocean Energy Mgmt.*, 2018 WL 5919096, at *13 (C.D. Cal. Nov. 9, 2018) ("The regulation does not automatically require that an EIS be prepared just because data gaps exist.").

### 2. Highly Controversial

AWHC next argues that BLM should have prepared an EIS because its decision to utilize gelding and GonaCon was highly controversial. More specifically, AWHC argues that there is a substantial dispute between the administrative record (once again relying on the 2013 NAS report) and BLM's decision to use gelding and GonaCon. (ECF No. 32 at 31). AWHC also takes issue with BLM's assertion that its proposed action is not controversial because it has "many years of management of wild horses." (*Id.*) AWHC finally argues that because BLM received thousands of comments opposing its proposed action, the Court must find that the action is controversial. (*Id.* at 32).

The Court will address AWHC's final argument first because it flies in the face of clearly established law. The Ninth Circuit has repeatedly stated that mere opposition to the government's proposed plan is insufficient to demonstrate a controversy. *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1240 (9th Cir. 2005) (citing *Blue Mountain Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998)). Thus, AWHC has no basis to assert that the Court should apply the "plain meaning" of the term "controversial,"[13] and even so, the overwhelming majority (97%) of the public comments were little more than form letters sent from an environmental activist website. (AR at 1626–13698).

Turning to AWHC's other two arguments, an action will be considered "highly controversial" only when a substantial dispute exists to the size, nature, or effect of the major federal action. *Humane Soc'y of the U.S. v. Locke*, 626 F.3d 1040, 1057 (9th Cir. 2010). A substantial dispute exists when evidence casts a serious doubt upon the reasonableness of an agency's conclusions. *Id.* (citing *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 736 (9th Cir. 2001)). Here, AWHC has failed its burden to demonstrate that there is a substantial dispute as to the size, nature, or effect of BLM's decision to utilize gelding and GonaCon. AWHC

---

[13] (ECF No. 32 at 32).

once again relies on the 2013 NAS report as proof that there is a dispute between the record and BLM's 2017 Gather Plan, but the Court has already repeatedly rejected AWHC's theory. AWHC cannot prevail on its EIS argument if it "cannot show there is some merit to opposing opinions." *Hillsdale Envtl. Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs*, 702 F.3d 1156, 1182 (10th Cir. 2012) (citing *Town of Cave Creek v. FAA*, 325 F.3d 320, 331 (D.C. Cir. 2003); *Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938, 957 (9th Cir. 2008)). As the Ninth Circuit quoted in *Bering Strait Citizens*, "[s]imply because a challenger can cherry pick information and data out of the administrative record to support its position does not mean that a project is highly controversial or uncertain." *Bering Strait Citizens*, 524 F.3d at 957 (quoting *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1240 (9th Cir. 2005)). Similarly, AWHC's argument about BLM's statement about it having "many of years of management of wild horses" does not turn BLM's actions highly controversial because it does not affect the size, nature, or effect of the government's actions.

### 3. Potential to Establish a Precedent

AWHC also argues that BLM's 2017 Gather Plan will establish a precedent for future actions, and thus it should have prepared an EIS. (ECF No. 32 at 32). The Court will dismiss this argument outright, however, because Ninth Circuit precedent is clear – EAs are "highly specific to the project and the locale, thus creating no binding precedent" for future actions. *Barnes v. U.S. Dep't of Transp.*, 655 F.3d 1124, 1140 (9th Cir. 2011) (citing *Town of Cave Creek v. FFA*, 325 F.3d 320, 332 (D.C. Cir. 2003)).

### 4. Harm to Wild Horses as a Cultural Resource

Next, AWHC contends that BLM should have prepared an EIS because its proposed action may cause loss or destruction of a significant cultural resource, namely wild horses. (ECF No. 32 at 34). AWHC argues that wild horses should be considered important cultural resources, and as such, BLM should have prepared an EIS analyzing the impacts that gelding and GonaCon will have on them. (*Id.*) But beyond its own assertions that wild horses are cultural resources (via comments during the commenting process) and references to the 2013 NAS report, AWHC cites to no authority, whether case or statute, in support of the concept that wild horses are cultural

resources. The only evidence that it presents comes from the preamble of the WHBA itself, where Congress stated that wild horses "are living symbols of the historic and pioneer spirit of the West." 16 U.S.C. §1331. While a preamble can give a general understanding of a statute's purpose, "they are not an operative part of the statute." *Rothe Dev., Inc. v. U.S. Dep't of Defense*, 836 F.3d 57, 67 (D.C. Cir. 2016). *See also Young v. Hawaii*, 896 F.3d 1044, 1067 (9th Cir. 2018) (stating that a court "has no license" to apply non-operative text of a statute as operative provisions). Congress could not have intended wild horses to be deemed "cultural resources" for NEPA purposes because as BLM states, if all wild horses were to be considered cultural resources, then every government action involving them would mandate the preparation of an EIS. (ECF No. 34 at 37). Furthermore, AWHC's contention that wild horse behaviors are important cultural resources because the public enjoys engaging in wild horse watching does not pass muster because the Ninth Circuit has explicitly stated the opposite. *Humane Soc. of U.S. v. Locke*, 626 F.3d 1040, 1057 (9th Cir. 2010) ("NEPA regulations do not treat wildlife viewing opportunities as a major factor in deciding whether an EIS is required.").

### 5. Threatening of a WHBA Violation

AWHC's last EIS argument is that BLM should have prepared one because BLM's actions threaten a violation of a federal law, namely the WHBA. (ECF No. 32 at 36). AWHC asserts this as essentially a catch-all argument, but as the Court has thoroughly discussed elsewhere in this opinion, the administrative record does not support the notion that BLM violated the WHBA. Therefore, the Court will reject AWHC's argument.

In conclusion, the Court finds that BLM's decision to not prepare an EIS for the 2017 Gather Plan is supported by the administrative record, and AWHC has not offered any convincing arguments to the contrary. Therefore, the Court will grant BLM's motion for summary judgment on this claim.

### IV. Conclusion

IT IS THEREFORE ORDERED that AWHC's motion to file supplemental authority (ECF No. 42) is GRANTED.

///

IT IS FURTHER ORDERED that AWHC's motion for summary judgment (ECF No. 32 is DENIED.

IT IS FURTHER ORDERED that BLM's motion for summary judgment (ECF No. 34) is GRANTED.

IT IS FURTHER ORDERED that the Clerk of Court shall enter judgment in favor of the defendants Ryan Zinke, Michael Need, and Jill Silvey, and against plaintiffs American Wild Horse Campaign and Kimerlee Curyl.

IT IS SO ORDERED.


DATED this 17th day of December, 2018.

_____
LARRY R. HICKS
UNITED STATES DISTRICT JUDGE